We have four cases on the panel before the panel, one of which is submitted on a record, and that one is for purposes of the oral record 2010-3180 Burroughs v. MSPB. The first case to be argued is case number 2010-5134, SCHOONER HARBOR VENTURES v. the U.S. Mr. Gerasi, is that correct? Gerasi. Gerasi. You are reserved five minutes for rebuttal. Yes, Your Honor. Thank you. You may proceed. Good afternoon, Your Honors. My name is Craig Gerasi. I'm with the law firm of Russian & Geis, and I'm here today on behalf of SCHOONER HARBOR VENTURES, Inc. This is my first time before this court, and I'd just like to say it's a real honor to be here. May it please the court. This matter was previously appealed on the issue of whether SCHOONER HARBOR had a cognizable property interest. This court found that SCHOONER HARBOR's right to develop its property was a cognizable property interest and remanded that case for proceedings consistent with that ruling. Today we are here on appeal of an adverse ruling on a motion to dismiss. The standard of review is de novo. The sole issue before this court today is whether SCHOONER HARBOR's takings claim has ripened. I would like to direct your attention to page 13. More precisely, isn't it whether, I guess, you're entitled to the benefit of the futility? Correct. If I could direct your attention to joint appendix page 13, I believe this is the first error of the trial court where the trial court stated that SCHOONER HARBOR cannot assert that no private development would be allowed. I believe this is the wrong standard, and I think the proper standard was promulgated in the Palazzolo case, which is located at 533 U.S. 606, where the Supreme Court stated that a takings claim is likely to have ripened once the permissible uses of the property are known to a reasonable degree of certainty. Well, where was the reasonable degree of certainty here? I mean, the Navy had gone, and they had gotten permission to develop, right? And this was a big silly, and they had gotten certain criteria. What has that got to do with your private property development? I think the Federal Wildlife and Fisheries Services issued a letter dated August 3rd and a biological opinion, and those are located at page 33 and 90 of the joint appendix. And I'll read a few passages out of there, brief passages, and this gets to the point of where they issued this broad opinion that regulated not only the Navy but also SCHOONER HARBOR. Well, that's implied. It didn't regulate any private development on there because that was under Section 7 of the statute, not under Section 10. I think there was some language in those letters and the opinion that actually did reference private development. And I think anyone looking at those documents would find it hard to believe that there would be any type of development allowed, whether it be the Navy or SCHOONER HARBOR. The question still remains as to whether or not you filed an application under Section 10 of the statute. Was there a Section 10 file? No, and we readily admit that we did not file an initial permit application. But the reason for that being that any initial permit application would have been denied because the Federal Wildlife and Fisheries Services had already issued an opinion that no development would be allowed without mitigation. But you don't know that without filing the application? Well, I don't think we can say that with absolute certainty, but I don't think that's the standard here. I think the standard is once the permissible uses of the property are known to a reasonable degree of certainty, and I think anyone would— Wait a minute. You just said that without mitigation. So you agree that certain types of property could be developed, but are you complaining only because we know they would have required some sort of mitigation? Well, I think that's the take that occurred here, is they regulated the property, and now the property is development-restricted. And anyone knows that a development-restricted piece of property commands a lower price than an unregulated piece of property. And I think that's where the take occurred when SCHOONER HARBOR had to buy the— So just by the fact that you have to file a permit, that devalues your property and that consists of a taking just because there's some regulation, even though they might ultimately approve your plan, right? No, Your Honor. No, that's not what I'm arguing. I'm not saying that the actual filing of a permit was the regulation. I'm saying that when the Federal Wildlife and Fisheries Services stepped in and said that if land remains in private ownership and the use of that land would result in a take of the cranes, that take would be prohibited. They go on in the biological opinion to state what types of activities would result in a take, and they say any human activities, such as noise, vibration, pollution, visual disturbances. But the property as developed by the Navy was not that limited. Well, it was— Well, I mean, obviously there's noise and vibration and whatever associated with whatever the Navy's developing, right? Right. So obviously you didn't—you knew that the Navy—what the Navy was allowed to do. So why would you take away that there's no way we can do this for anything because there's absolutely no noise, vibration, et cetera allowed? I think because if you look at the documents as a whole, which were given to Schooner Harbor and relied upon by Schooner Harbor, they're given from their own government, the Federal Wildlife and Fisheries Services. And I think taking a look at all these documents together, I even think—I don't think there is any way that one can look at these documents and think that any type of development would be allowed, whether it was the Navy or a private entity. And I think in the previous appeal, Judge Newman hit the nail on the head when she stated, reading these documents, she didn't have the impression that the Federal Wildlife and Fisheries Services was stating that if you're only building 188 units for the Navy, then mitigation property would be required. Whereas if you're only selling individual one-acre lots, then no mitigation is required. There were no such caveats in the biological opinion. And I just think this is the clearest case where the futility doctrine should be applied. But how do you establish futility if you've never applied for a permit? Well, I don't think that an initial permit is always required and not applying is fatal to the claim. And there are just times when opinions have been issued that I don't think an initial permit would always be necessary. I think that's the point of the futility doctrine is to avoid unnecessary repetition. And that's kind of what we would have had here. Nobody looking at these documents would have said, well, maybe they will allow me to develop when they've already regulated, when they've regulated the property and they've spoken in such broad, sweeping language. Just as a practical matter, how would one, even if you had jurisdiction here, how would one ever calculate what damages you're going to be seeking? I mean, there's no plan here for how the property would have developed. We haven't identified the extent to which, because you didn't ask for a permit, the mitigation efforts would have encroached on whatever profitable enterprise private property development would result in. So how could you ever pursue any kind of damages in this context? Well, I think that would get into the Penn Central analysis and the issue of what their reasonable-backed investment expectations were. And I guess at this point, the only damages that were there is that the Schooner Harbor was required to expend, I think it was $300,000 to $400,000 to purchase this mitigation property that the Federal Wildlife and Fisheries Services had now regulated. But that's what you were seeking in the earlier case, right? And the Federal Circuit said in the prior appeal, right? Right. And the Federal Circuit said no. The Federal Circuit said there was no, there wasn't even a property interest here, a cognizable property interest. So you're trying to recoup this $300,000 through the other door? Well, I don't think it's through the other door. I think the trial court just missed the issue. They stated that the property interest that we were claiming was taken was that we're not allowed to sell this piece of property to the Navy without mitigation property. And that was not what we were arguing. What we were arguing is that our right to sell this property to anyone without the mitigation. We weren't allowed to develop the property, period, without the mitigation property. I don't think we could have put a hut out there without being required to, I guess, whatever piece we used to replace that with some type of mitigation property. But once again, you never really know that until after you apply for the permit. Well, I think that's the absolute... The FWS could give you some kind of development, but you're not quite sure what it is until after the permit has been applied for. So how can there be a regulatory taking of the property at that point in time unless there is a restriction which is imposed on the property on your particular client? Well, I just think that looking at the Navy's plans and the letters, although they were directed just to the Navy, I think the Federal Wildlife and Fisheries Services, even though we didn't apply for a permit, they had issued this language that it specifically addresses private ownership. And if the land remains in private ownership, that a take would be prohibited. Let me ask you, though. Did I pronounce it right? Jurassic. Got it wrong on both the front and the end. Sorry. I mean, you cite in your brief the Gilbert case. And that case is, I think, helpful in that it collects, starting at page 60, various Supreme Court decisions dealing with the futility doctrine. And those cases seem to say the futility doctrine is a very narrow exception. And really, I think one of them states, a property owner cannot rely on the futility exception until he or she makes at least one meaningful application. Now, I will agree with you that looking at what was in the record here, one might reasonably conclude that, you know, it was unlikely that Fish and Wildlife Service was going to agree to some use without mitigation. I'll concede that, I think, for purposes of our discussion. But given what has been said about the futility doctrine, I don't think that is enough as a matter of law to let the property owner off the hook in terms of not having to apply. You still have to go through the process. Otherwise, the whole statutory regulatory process might be frustrating. Well, Your Honor, I think the Gilbert case is consistent with the Palazzolo case when they stated that the filing of one meaningful application will ordinarily be necessary, although not alone sufficient precondition for invoking the futility exception. And I think it's consistent with Palazzolo with the reasonable degree of certainty standard because these courts are recognizing that there may be times that a hard-line rule, that one permit application is always required, is simply not reasonable. There are too many possible situations we could think of going back and forth where a permit application would just be a waste of time and resources. And that's what we had in this case. And I think there's no better case for this court to define or further develop the futility doctrine, and possibly, if this is the rule that one permit application is always necessary, do away with that rule. I just don't think it's fair, and I don't think... Well, I don't know if we could do away with it. The Supreme Court has articulated it. That's not for us to determine. Well, I don't think the Supreme Court has stated that one initial permit application is always required. I don't think any case out there is factually similar to this case. You're in the rebuttal time. Do you want to preserve it? I'll preserve it. Yes, Your Honor. Thank you. Mr. Lundman. May it please the Court, Robert Lundman, representing the United States. Schooner Harbor's taking claim is not ripe here because they never applied for the incidental take permit. But why is he right, though, that if you take a look at that issuance of those letters by the Fish and Wildlife Service, there's some language in there which really tells you that no matter whether you apply or not, we're going to require these conditions for the development of this property. Couldn't that be transferred over to a Section 10 application without too much of a problem? Do we really have to go through the motions of filing for a permit under 10? Is that required? I don't think it would just be going through the motions here. I don't think that language in the letters or the biological opinion goes nearly that far. In the August 3rd letter, which is the primary letter they rely on, it says, if the land remains in private ownership and use of that land would result in the take of cranes, that take would be prohibited. That sentence just states the endangered species that prohibits take. The next sentence, though, is key, and this is the one that Schooner Harbor doesn't dwell on. The only option for allowing take by a private individual that is incidental to an otherwise lawful action, such as development, would be a Section 10A1B permit issued to the landowner. So that letter, which is the letter they hold out as really most clearly supporting their case, explains to them expressly that they need to apply for a Section 10 permit if they're concerned about restriction of private development. And so I don't think the record here can support their claim that the Fish and Wildlife Service or anyone else ever stated that all development was prohibited. The biological opinion, then, as clear from its face, focuses specifically on the Navy's 188-unit proposed development. It does not opine on what a private developer could do, alternative developments. The Navy had a specific goal in mind, and the biological opinion focuses on that goal and the impacts of that goal. So what about if they came and they decided, well, we want our private property development scheme is for 188 condos, and essentially the structure is pretty much, at least environmentally, the way the Navy was going to go about doing their housing units. So that's their proposal for private property development. Could they not safely assume under that circumstance that they would get precisely the same answer that you received for your 188 family units? I don't think they could make that assumption, because they'd be moving forward under Section 9 and 10 of the ESA and not Section 7. And the Supreme Court in the Babbitt case says that Section 7, and that's what applied to the Navy, imposes a broad affirmative duty to avoid adverse habitat modifications that Section 9 does not replicate. So right there the Supreme Court is explaining you can't simply equate the Section 7 consultation process to avoid jeopardy and to avoid critical habitat impacts. So you think the government is statutorily going to be more generous to a private property developer than it is to its own military? That's what you're suggesting, right? There's two points. One is Section 7 imposes more strict requirements in some sense with respect to protecting critical habitat. So the Fish and Wildlife Service would be imposing a different set of law. Second, it's impossible to know, and the Section 9 and 10 process is an iterative discretionary one. The developer comes to the Fish and Wildlife Service and says, here's our permit application, here's what we want to do. It's not just a yes or no stamp process, but rather the Fish and Wildlife Service assesses the impacts of that proposal on the species, and then there's dialogue that tries to work out what's the best way for the project to go forward without too much take of the species, so that it would be prohibited under Section 9. So that process could very well result in a different answer for a private developer or a different answer for the Navy. But isn't that the same process you have in the Section 7? There is a given take, trying to take in the sense of negotiation, not the take of a particular requirement under the statute. But if you have the Navy that wants to develop a piece of property, they do sit down with FWS and say, this is what we want to do, why don't we see what can be done in order for us to get a permit? And it's the same process that would happen under 9 and 10. There's negotiation, there's informal consultation, and back and forth under Section 7, there's the process I described under Section 9 and 10. So in the sense that there's negotiation and discussion in both, that's right. The finish lines are not the same because the ESA sets forth a different standard under Section 7 and a different standard under Section 9. So that's the first difference. I wonder if that is a different standard or not. The language is very similar to it, isn't it? The take language is the same? Well, take is prohibited both for private individuals and the federal government, but Section 7 imposes the additional no jeopardy, avoid jeopardy in the existence of the species, and also it has a critical habitat prong that is lacking in Section 9. So the substance is different. But does the government's position here rest exclusively on that? I mean, assuming even that that were rejected, assuming they were just one provision or the two provisions are identical, would you still have an argument here that we don't know what they were going to develop? You can't go forward with a case and draw conclusions about the end result when you don't know what the extent of development is. That's the other half of the argument. So that's the first half really. Until they come to the government, come to the Fish and Wildlife Service with a proposal, there's nothing to assess and begin this discretionary, iterative negotiation. So it could conceivably, based on the language of the letters, be a proposal they came up with, a hut or two or whatever, where the mitigation costs, to the extent there might be some, might be minuscule, right? Right. We just don't know. They could have proposed something where more mitigation is required. They could have proposed something where less mitigation is required. Well, are you clear that they could take away from the letters that some mitigation would be required? Do you think that's clear? I don't think that's clear from the letters at all because the letters simply don't address anything but what the Navy was suggesting. If there were letters that were directed to Schooner Harbor, that Schooner Harbor said, hey, can we do this, and the Fish and Wildlife Service had opined on it, we'd have a very different case. We don't have any of that back and forth between Schooner Harbor and the Fish and Wildlife Service. It's all between the Fish and Wildlife Service and the Navy with Schooner Harbor attempting to complete its sale to the Navy. So, Mr. Lemon, there were no, so I'm clear in this, there were no face-to-face dealings between Schooner Harbor and Fish and Wildlife Service. Is that correct? I don't know if there ever were any discussions at all. There was no. The record is clear. There's a declaration at the end of the Joint Appendix, I don't have the right page, from the Fish and Wildlife Service saying, we never discussed Section 9 or Section 10 with Schooner Harbor. Schooner Harbor wanted the sale to go through. They asked the Navy to push forward. They asked Fish and Wildlife Service to hurry up and complete a biological opinion. Was Schooner Harbor provided these letters by the Navy because of its negotiations with the Navy for the housing project? I'm not sure of the exact mechanism of how Schooner Harbor was. Before the sale of the property. But they were provided because Schooner Harbor was asking the Navy, please push this sale through, and the Navy and Schooner Harbor both told the Fish and Wildlife Service, please hurry up and issue your biological opinion because once that's been issued, then we can complete this deal. So that's the context in which the letters were provided to Schooner Harbor. But the letters themselves and the biological opinion are clearly not addressing a private development. In terms of cases, Your Honor mentioned the Gilbert case from the First Circuit. There's two pieces of language here that are, I think, critical there. One is the court says, you have to have at least one permit application in Gilbert. We don't have any here. The second piece is, and I'm quoting, a sort of inevitability is required. And the record doesn't come anywhere close to showing a sort of inevitability with respect to what would happen with respect to private development plans. Finally, about calculating damages and the amount of the taking, that's the point. And the Supreme Court has said, you need to apply for a permit in these circumstances so that we, the courts, can determine whether the regulation has or has not gone too far. And doing that tricky Penn Central multi-factor analysis requires a record that the court can look at and say, oh, this goes too far, this doesn't go too far. But we just don't have that background here. And so the claim is not right. Even if there were no time bar here, can they go in now and ask for a permit? They don't own the land anymore, obviously. They don't own the land anymore. So I presume nobody would process a permit from someone who's not the landowner. That's right. They don't own the land anymore, so there's no, they can't ask, they can't apply for, there's nothing they can apply for a permit for since they don't have the land anymore. Well, there's no standing for them to apply for the permit at this point. Right. So unless the court has any further questions, I'll refer you to my brief. Thank you. Thank you. Your Honors, I think an important point to address is that with all these documents, the Federal Wildlife and Fisheries Services knew that Schooner Harbor was receiving these letters and documents and of course would be relying upon them. It was coming from their own government. I think every United States citizen has or should have the ability to rely upon an opinion that's given to it by its own government. But it was not an opinion given to you. It was an opinion given for the benefit of the Navy. Correct. But the biological opinion, when it addresses human activities, I know of no difference between the Navy's human activities and Schooner Harbor's human activities. I think, you know, we're all human. We all make noise, vibration, pollution, visual disturbance. I can't think of anything sitting here right now. But isn't it certainly possible, Mr. Gracie, that you might have a situation where a private housing development, as I think Judge Probst referred to condominiums, would generate or could generate a lesser environmental intrusion, if you will, than military housing? I mean, I don't know if that's the case or not, but it could be, it might be, it might not be. But doesn't that suggest a reason why going through the application process would be necessary? Well, I think under normal circumstances, had no one ever reviewed the property and looked at its uses or proposed uses, then I think, yes, that's the purpose of the permit application. If I just walked off the street and no one had tried to develop the property and asked the Wildlife and Fisheries Services for an opinion, then I think they would ask me, well, what type of development are you doing? And then they would tell me the possible effects. But I think when the Navy had already been there and had already negotiated with the Federal Wildlife and Fisheries Services and they issued these opinions stating that all remaining acreage will be indirectly impacted and completely lost as suitable habitat for the crane. No, I understand that. And you're correctly referring to the record, but what I guess I'm trying to say is isn't it possible that a 180 to 188 unit private condominium sort of plan might be viewed as less of an environmental problem or less of an environmental issue than a 180 to 188 unit for military housing? I think that's possible, but I still think the mitigation property would have been required regardless of what was being developed. Well, maybe less mitigation, though. Possibly. Maybe something could have been worked out. Possibly. And I think that's an issue, if you get past the rightness issue, then I think that's part of the Penn Central analysis. But you've got to get into the door first to get to that, and I think that's where we're at now. And the property was regulated once the parties all knew that there would be no development without mitigation property. And I think what the government's just trying to do is now say that because we issued these broad sweeping regulations and now that you filed suit for a takings claim, well, maybe we would have told you something different. And I just don't think that's fair, and I think Justice O'Connor has stated that concepts of fairness and justice underlie the takings clause. And then, therefore, if there's no more questions of the Court, I was told always to ask for the relief that you seek, and I would ask that the Court apply the correct standard in this matter and reverse and remand for trial for the Penn Central analysis. Thank you. Thank you very much. Case is submitted.